ATTORNEY FOR THE RESPONDENT
Kevin P. McGoff
Indianapolis, Indiana

ATTORNEYS FOR THE INDIANA SUPREME COURT
DISCIPLINARY COMMISSION
G. Michael Witte, Executive Secretary
Charles M. Kidd, Staff Attorney
Indianapolis, Indiana

# In the
# Indiana Supreme Court

No. 18S00-0905-DI-220

IN THE MATTER OF:

MARK R. MCKINNEY,

*Respondent.*

Attorney Discipline Action
Hearing Officer Steven H. David[1]

**June 16, 2011**

**Per Curiam.**

We find that Respondent, Mark R. McKinney, while serving as a deputy prosecuting attorney, conducted asset forfeiture proceedings in a manner that created a conflict of interest between his duties as a public official and the private gain he realized in the forfeiture proceedings. On numerous occasions when the ethics of the asset forfeiture procedures were called into question, Respondent turned a blind eye and acted to protect his private interest in his continued pursuit of forfeiture property. For this serious attorney misconduct, we find that Respondent should be suspended from the practice of law in this state for 120 days with automatic reinstatement.

---

[1] The Honorable Steven H. David was appointed as a Justice to this Court after his service as hearing officer in this case. Justice David is not participating in Supreme Court review of his hearing officer's report.

This matter is before the Court on the report of the hearing officer appointed by this Court to hear evidence on the Indiana Supreme Court Disciplinary Commission's "Verified Complaint for Disciplinary Action," and on the post-hearing briefing by the parties. The Respondent's 1991 admission to this state's bar subjects him to this Court's disciplinary jurisdiction. See IND. CONST. art. 7, § 4.

## **Background**

The salient facts in this case are stipulated by the parties. Although the parties filed briefs on the appropriate sanction, neither party filed a petition for review of the hearing officer's findings of fact. When neither party challenges the findings of the hearing officer, "we accept and adopt those findings but reserve final judgment as to misconduct and sanction." Matter of Levy, 726 N.E.2d 1257, 1258 (Ind. 2000).

Charges against Respondent. The Commission charged Respondent with violating these Indiana Professional Conduct Rules prohibiting the following misconduct:

> 1.7(b) (effective Jan. 1, 1987): Representing a client (the State) when the representation may be materially limited by attorney's own self-interest.
>
> 1.7(a)(2) (effective Jan. 1, 2005): Representing a client when there is a concurrent conflict of interest because of a significant risk that the representation may be materially limited by attorney's own self-interest.
>
> 1.8(l): While serving as a part-time or deputy prosecutor, representing a client as a private attorney in a matter wherein there exists an issue upon which he has statutory prosecutorial authority or responsibilities. (The rule was numbered 1.8(k) during part of the relevant period.)
>
> 8.4(d): Engaging in conduct prejudicial to the administration of justice.

Factual basis for the charges of misconduct. From 1995 through the end of 2006, Respondent was a salaried deputy prosecuting attorney ("DPA") employed at the Delaware County Prosecutor's Office by Richard Reed, the prosecuting attorney ("Prosecutor Reed"). On January 1, 2007, Respondent began serving a term as a salaried elected prosecutor.

2

Respondent prosecuted a variety of criminal cases, including drug offenses. Respondent, while a DPA, worked with the Muncie-Delaware County Drug Task Force ("DTF") and was personally involved in drug investigations and many of the resulting criminal cases. During arrests and/or the execution of search warrants, the police seized money and other property from drug suspects. Criminal charges were determined by the DPA assigned to the case, and Respondent prosecuted many of the defendants charged with drug crimes.

In addition to his DPA salary, Respondent received attorney fees as a private practitioner for bringing suits for the forfeiture of criminal defendants' property, as did other DPAs, including Louis Denney. In 1995 and 2004, Respondent and Prosecutor Reed entered into written fee agreements ("Fee Agreements") under which Respondent would receive an amount equal to 25% of any judgment entered in a civil forfeiture action Respondent brought under a statute currently codified at Indiana Code § 34-24-1-1, *et seq*.

Prosecutor Reed contemplated that the same DPA would handle both the criminal case and the forfeiture case associated with it, and that the criminal case would conclude before any resolution of the forfeiture case. Otherwise, the costs associated with the criminal case would not be known. Respondent and another lawyer were in charge of the civil forfeiture process; Prosecutor Reed did not personally oversee it.

Acting pursuant to the Fee Agreements, Respondent filed civil forfeiture actions in Delaware County courts on behalf of the State, the DTF, and other local police agencies, seeking forfeiture of property, including cash, that police seized from defendants in Delaware Country criminal cases that Respondent prosecuted. In 1996, a private bank account, called the "Asset Forfeiture Attorney Fee Account," was opened, with Respondent and DPA Denney as signatories, into which their 25 percent share of forfeited funds were deposited and then disbursed to them.

Prosecutor Reed interpreted the Fee Agreements to require Respondent to handle forfeiture cases outside his duties as a DPA. Respondent, however, viewed the civil forfeiture cases as part of his duties as a DPA and testified that he believed his client was the State in these

3

matters. The hearing officer rejected Respondent's interpretation, noting that Respondent's invoices for payment were in the name of "Mark R. McKinney, attorney at law," that he pursued forfeiture cases for other entities, including Ball State University, and that he stated in a 1999 memo during an investigation by Judge Richard Dailey (discussed below) that DPAs were hired as "Plaintiff's counsel" to pursue the cases for a 25% contingent fee.

Beginning in 2002, Respondent used what he called "Confidential Settlement Agreements" ("CSAs") to transfer seized property, including cash, from criminal defendants to the City of Muncie, through private agreement by the parties without court supervision or public disclosure. Respondent invoiced the City of Muncie for and collected 25% of the money transferred pursuant to any CSA. Respondent claimed compensation from the CSAs based on his interpretation of the Fee Agreements. The Court finds, however, that this interpretation was clearly erroneous. The Fee Agreements reference forfeitures of "property seized pursuant to I.C. 34-4-30.1 *et seq.*" and provide for fees of 25 percent of "any judgment entered in such actions" or the fee "allowed by the court in such actions." Transfers of property pursuant to a CSA were accomplished without court review or authorization.[2]

In many instances, criminal cases were open while related civil forfeiture actions were also open or while Respondent engaged in CSA negotiations with criminal defendants. Respondent at times engaged in plea agreement negotiations regarding criminal cases with criminal defendants before and/or after Respondent also engaged in CSA negotiations or settlement negotiations regarding related civil forfeiture actions with the same criminal defendants. Respondent did this knowing that he would receive payment as personal compensation equaling 25% of the amount transferred as a result of the action. There is no evidence, however, that Respondent ever explicitly agreed to offer favorable treatment to a criminal defendant in exchange for money transferred either by CSA or a civil forfeiture action. Respondent did not attempt to conceal his activities concerning his compensation in forfeiture cases.

---

[2] Prosecutor Reed testified that he did not know about the CSAs until after he left office and questioned their legality because they circumvented court supervision.

Over the years, there were a number of inquiries and investigations into aspects of Delaware County's forfeiture program. The auditor of the State Board of Accounts ("Board") raised the issue with Prosecutor Reed in 1998. The Board sought a advisory opinion from the Indiana Attorney General on the issues of whether various attorneys within a prosecutor's office could be paid in excess of their state minimum salary from funds generated by the prosecution of forfeiture and other cases; and if so, whether Indiana Code § 36-2-5-14 prohibited such compensation in excess of $5,000. The Attorney General's advisory opinion, dated November 18, 1998, said that such payments could be made and that the statutory cap applied only to full-time prosecuting attorneys but not to others, including DPAs. The opinion did not address any conflict of interest issues.

In 1999, Respondent sought guidance from the Indiana Prosecuting Attorneys Council regarding the way funds obtained from forfeitures were handled. He disclosed that court orders divided the assets such that 25% went to attorney fees, which was deposited into and disbursed from the Asset Forfeiture Attorney Fee Account. The Council did not alert Respondent to any potential ethical problems. However, Respondent did not fully explain how the procedure worked and did not raise any conflict of interest issues. He made no disclosure of and sought no guidance about disposing of cases by "Confidential Settlement Agreements" beginning in 2002 rather than under the judicial supervision required by the Indiana Code.

In 1999, the Commission on Judicial Qualifications ("CJQ") sent Delaware Circuit Judge Richard Dailey a "Notice of Inquiry" regarding use of the Asset Forfeiture Attorney Fee Account. Respondent sent Judge Dailey a memorandum explaining and defending the procedure. Judge Dailey then responded to the CJQ by describing the account and procedure and asking for guidance from the CJQ. In response, the CJQ sent Judge Dailey a letter on April 19, 1999, expressing concern that forfeited assets were deposited into a private account and, apparently *sua sponte*, "question[ing] the propriety of a practice whereby the deputy prosecutors receive a percentage of the fruits of forfeiture actions, which practice appears to give them a personal stake in the proceedings." The CJQ also stated that the matter had been referred to the Disciplinary Commission for its review. (Respondent testified that he did not see the CJQ's letter until 2008 when Judge Dailey initiated an investigation, discussed below. )

A request for investigation into the forfeiture procedures was filed with the Commission on April 19, 1999. Respondent replied and requested that the case be dismissed. No charges were filed, but the matter was not formally dismissed.

Another request for investigation into the forfeiture procedures, which did not explicitly mention a potential conflict of interest, was filed with the Commission by the mayor of Muncie on May 19, 2008. On June 20, 2008, the mayor filed a petition for a special prosecutor to investigate the forfeiture procedure. A special prosecutor was appointed and filed a report that focused on the remittance and processing of drug forfeiture monies. The investigation concluded without criminal charges against Respondent.

After the mayor filed her petition for a special prosecutor, Judge Dailey *sua sponte* initiated litigation concerning the forfeiture procedure. That litigation ended in March 2009 with an agreement by the parties that the goals of the investigation were achieved by a new local rule. Respondent was not required to make any reimbursement of the fees he had received in forfeiture cases, and the State Board of Accounts was able to account for all funds at issue.

The hearing officer's conclusions. The hearing officer concluded that Respondent violated the Professional Conduct Rules as charged. On numerous occasions, Respondent knew or should have known that the ethics of the asset forfeiture program and his management of it were called into question. When such questions arose, Respondent acted to protect his private interest in his continued pursuit of forfeiture property. Respondent did not end the program until the conclusion of the civil action concerning the procedure.

Facts in Aggravation and Mitigation. The hearing officer found the following facts in aggravation: (1) Respondent engaged in misconduct over an extended period of time; and (2) he never himself thoroughly investigated concerns and complaints about the forfeiture procedure, instead relying on opinions of others based on incomplete information.

The hearing officer found the following facts in mitigation: (1) Respondent has no prior history of disciplinary action; (2) he has been an active member of the Indiana legal community; and (3) he has been a leader in various community organizations.

## Discussion

The parties stipulate that the narrow issue in this case is whether there is a conflict of interest when a deputy prosecutor contracts privately to do what the elected prosecutor could properly contract with private counsel to handle.[3] At this point in these proceedings, the parties do not dispute the hearing officer's findings of fact or his conclusion that Respondent violated the rules as charged. The only issue the parties briefed was what discipline is appropriate.

Although Prosecutor Reed set up and approved the procedure under which Respondent retained 25% of civil forfeiture judgments, the conflict of interest created by this system of compensation when he was also prosecuting the criminal action should have been apparent to Respondent. At no time did he undertake an independent assessment of the procedure. Had Respondent at any time taken a critical look at the system, he should have been able to see that a DPA's representation of the State could have been materially limited by the DPA's personal financial interest in the CSAs or the outcomes of civil forfeiture actions. Respondent essentially turned a blind eye to these now-conceded ethical violations for well over a decade.

It is apparent that Respondent had still not critically examined his conflict of interest even by the time of the hearing in this case. He testified that the Fee Agreements made the pursuit of forfeiture cases part of his duties as a DPA. However, the Fee Agreements specifically required that pursuit of forfeiture cases was not to interfere with Respondent's duty as a DPA, Prosecutor Reed testified unequivocally that pursuit of forfeiture cases was ancillary to the duties of a DPA, and Respondent billed and received payment for the forfeiture cases as a private attorney.[4]

---

[3] The propriety of Respondent's use of the Asset Forfeiture Attorney Fee Account, his accounting of funds, his use of CSAs to effect forfeitures without court supervision or public disclosure, and his misinterpretation of the Fee Agreement to apply to CSAs are not at issue in this disciplinary proceeding, although the first three were major issues in some of the other investigations of the forfeiture procedure.

In addition to the aggravating facts found by the hearing officer, we find that Respondent has been not been entirely forthcoming and cooperative with the various investigations into the forfeiture procedure. Respondent failed in prior investigations to reveal fully the details of the forfeiture procedure that may have raised the conflict of interest issue at an earlier point. As noted by the hearing officer, after being elected prosecutor, he rejected an inquiry by the mayor of Muncie about the membership of the DTF. He attempted, without success, to procure an order from this Court removing Judge Dailey from the litigation he initiated to investigate the forfeiture procedure. *See* State ex rel. McKinney v. Delaware Cir. Ct., 18S00-0806-OR-345 (Ind. July 7, 2008).

As a deputy prosecutor, Respondent "served a public trust to enforce the law and the state was entitled to his undivided loyalty." Matter of Ryan, 824 N.E.2d 687, 689 (Ind. 2005).

> Attorneys charged with law enforcement responsibilities must conduct themselves at all time in a manner that promotes public confidence in the justice system. Prosecutors are not simply advocates, but they are also . . . ministers of justice . . . . As such, we hold prosecutors to a high standard of ethical conduct.

Matter of Winkler, 834 N.E.2d 85, 90 (Ind. 2005) (citations and internal quotations omitted).

In some cases, the Court has given public reprimands to DPAs who have committed an isolated violation of the rules prohibiting conflicts of interest. *See* Matter of Barce, 849 N.E.2d 1145 (Ind. 2006); Matter of Tyler, 823 N.E.2d 277 (Ind. 2005). More serious, ongoing violations, however, have resulted in suspension from practice. In Ryan, we imposed a suspension of nine months without automatic reinstatement on a DPA who reduced traffic charges against defendants who obtained international driver's licenses from a business operated by the DPA and his wife.

---

[4] To be clear, the Court is not penalizing Respondent for asserting a defense to the charges against him and proceeding to a hearing. The Court notes only his continuing failure to evaluate critically the forfeiture compensation procedure.

> As a deputy prosecutor, respondent served a public trust to enforce the law and the state was entitled to his undivided loyalty. **Respondent's conduct breeds mistrust and lack of confidence in the judicial system. He used his position as a deputy prosecutor to obtain a significant financial windfall for himself.** By serving both as prosecutor and as intermediary for those seeking a favorable plea agreement, respondent gave the impression that justice could be bought. As a public officer charged with the administration of justice, respondent's behavior had the capacity to bolster or damage the public's perception of the criminal justice system. Unfortunately, respondent chose to follow a path that damaged the perception of the administration of justice. By conducting a business that impacted upon his resolution of traffic violations, respondent violated the public's trust. This is serious misconduct, which cannot be ignored.

Id. at 689 (emphasis added, citations omitted).

In Matter of Curtis, 656 N.E.2d 258 (Ind. 1995), we imposed a 30-day suspension with automatic reinstatement on a part-time elected prosecutor who represented a client in small claims matters while also representing the State in a criminal matter involving the client's delinquent taxes.

> Respondent's conduct, if anything, frustrates our hope that all prosecutors routinely exercise full prosecutorial discretion, because concurrent representation of this sort threatens to impede its full exercise. Thus, **our holding today is meant to preserve and foster the exercise of prosecutorial discretion by ensuring an optimum environment in which to do so.**

Id. at 260 (emphasis added).

Although there is no evidence in this case that Respondent made any explicit *quid pro quo* offer of favorable treatment to any criminal defendant in exchange for the forfeiture of property from which Respondent would be compensated, it would doubtless be evident to such a defendant, and to his or her attorney if represented, that prosecutorial discretion in how to proceed with the criminal case was held by one who stood to reap personal financial gain if the defendant agreed to the forfeiture of his or her assets. Respondent's misconduct created an environment in which, at the very least, the public trust in his ability to faithfully and independently represent the interests of the State was compromised.

9

For these reasons, we conclude that a period of suspension with automatic reinstatement is warranted.

## Conclusion

The Court concludes that Respondent violated the Indiana Professional Conduct Rules by representing the State when the representation could have been materially limited by his own self-interest in receiving compensation as a private attorney from property forfeited in civil forfeiture actions and under CSAs.

For Respondent's professional misconduct, the Court suspends Respondent from the practice of law for a period of 120 days, beginning July 28, 2011. Respondent shall not undertake any new legal matters between service of this order and the effective date of the suspension, and Respondent shall fulfill all the duties of a suspended attorney under Admission and Discipline Rule 23(26). At the conclusion of the period of suspension, provided there are no other suspensions then in effect, Respondent shall be automatically reinstated to the practice of law, subject to the conditions of Admission and Discipline Rule 23(4)(c).

The costs of this proceeding are assessed against Respondent.

The Clerk of this Court is directed to give notice of this opinion to the hearing officer, to the parties or their respective attorneys, and to all other entities entitled to notice under Admission and Discipline Rule 23(3)(d). The Clerk is further directed to post this opinion to the Court's website, and Thomson Reuters is directed to publish a copy of this opinion in the bound volumes of this Court's decisions.

All Justices concur, except Rucker, J., who concurs in part and dissents in part, and David, J., who did not participate.

Agreeing with the recommendation of the hearing officer that a public reprimand is appropriate in this case, Justice Rucker dissents to the sanction imposed by the majority. Otherwise he concurs in the majority opinion.